IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

### AT JUNE TERM, 1870.

### ROBERT HAMILTON v. JOSEPH L. VOUGHT.

1. A note fraudulent in its inception cannot be invalidated in the hands of a party taking it for value, before maturity, unless actual fraud can be shown in such party so taking it.

2. That such note was taken under suspicious circumstances will not avail to defeat it, unless such circumstances are sufficient to prove *mala fides* in the holder of the paper.

3. Mere carelessness in taking such note will not, of itself, impair the title; but carelessness may be so gross that bad faith may be inferred from it.

Case certified from the Sussex Circuit Court.

For plaintiff, *Hamilton* and *McCarter*.

For defendant, *Coult* and *Pitney*.

BEASLEY, CHIEF JUSTICE. We have presented to our consideration in this case but a single question, *viz.*, whether the title of a holder of negotiable paper, acquired before it was due, for valuable consideration, is affected by the fraud

187

of a prior party, without proof of bad faith on the part of such holder.

At the trial of this cause, the jury was instructed that if the holder of the note sued on—the plaintiff in the action—acquired his title under circumstances which should have put a person of ordinary prudence upon his guard, the note was invalid, if its inception had been fraudulent.

The verdict was in favor of the defence, and the plaintiff now insists that the judicial instruction should have been, that suspicious circumstances attending the acquisition of his title were not sufficient to defeat his claim, unless of a character to raise a conviction of actual fraud on his part.

Counsel who so ably argued this case in behalf of the defendant, did not deny that the modern English authorities were hostile to their position, but they went upon the ground that the rule thus sanctioned was an innovation, and consequently would not be followed by this court. The ancient rule, it was maintained, is that declared in *Gill* v. *Cubitt*, 3 *Barn. & Cress.* 466. This decision was made in the year 1824, and, beyond all question, it sustains the principle now claimed by the defence, for, in the reported case referred to, the jury were explicitly told that "there were two questions for their consideration : first, whether the plaintiff had given value for the bill, of which there could be no doubt; and, secondly, whether he took it under circumstances which ought to have excited the suspicions of a prudent and careful man." The authority is directly in point, and the only question which can arise is, whether it correctly states the ancient rule of the common law upon the subject.

My first remark in this connection is, that from the opinion of the judges in the case of *Gill* v. *Cubitt*, it appears that the doctrine adopted was intended to be an innovation upon the antecedent practice, and that it was avowedly opposed to a decision of the greatest weight. Twenty-three years before, in the year 1801, Lord Kenyon, in *Lawson* v. *Weston*, 4 *Esp.* 56, had expressly repudiated the idea that suspicious circumstances, in the absence of actual fraud, would avoid a

note in the hands of a holder for value. But this doctrine did not harmonize with the views of the judge in the case of *Gill* v. *Cubitt*, and it was accordingly overruled. Thus, Chief Justice Abbott says, in his opinion: " I think the sooner it is known that the case of *Lawson* v. *Weston* is doubted, at least by this court, the better. I wish doubts had been cast on that case at an earlier time." And he concludes: " For these reasons, notwithstanding all the unfeigned reverence I feel for everything that fell from Lord Kenyon, by whom *Lawson* v. *Weston* was decided, I cannot think that the view taken by that learned lord was a correct one." Nor is this rejection of this antecedent decision attempted, in the slightest degree, to be put upon the foundation of pre existing authority; not a case is referred to for its justification, and although in *Lawson* v. *Weston*, the authority of Lord Mansfield, in *Miller* v. *Race*, was mooted, no remark is made on that circumstance. I think a perusal of the opinions in *Gill* v. *Cubitt* will satisfy any one that it was a well-understood intention to deviate from the legal rule upon this subject which had previously existed; or, if any doubt should remain, such doubt will certainly be dispelled by a reference to the case of *Slater* v. *West*, 3 *Carr & Payne* 325, decided in the year 1828, in which Chief Justice Abbott, (then Lord Tenterden) in laying down the doctrine that a person is not entitled to recover who takes a bill of exchange " under circumstances which ought to excite suspicion in the mind of a reasonable man," says: " This doctrine is of modern origin. I believe I was the first judge who decided this point at *nisi prius*. The court to which I belong confirmed my decision, and the other courts have, I believe, acted on the same principle." And Chief Justice Bayley, in his opinion in *Gill* v. *Cubitt*, is equally explicit. " But, it is said "—such is his language—" that the question usually submitted for the consideration of the jury in cases of this description, up to the period of time at which my Lord Chief Justice's direction was given, has been whether the bill was taken *bona fide*, and whether a valuable consideration was given for it. I

admit that has been generally the case." From these cita-tions, I think it is manifest that the judges who participated in the decision of the case of *Gill* v. *Cubitt* were aware that by the views expressed by them, they introduced a novelty, and departed from the older practice of the courts. That the principle adopted in that case was an innovation, seems to me unquestionable. I have shown that it is irreconcilable with *Lawson* v. *Weston*. So it plainly occupies the same relation to the case of *Peacock* v. *Rhodes, Doug.* 632, decided by Lord Mansfield in 1781. This rule which it endeavors to overthrow will be found sustained in *Miller* v. *Race,* 1 *Burr.* 452; *Price* v. *Neal,* 3 *Burr.* 1355; *Grant* v. *Vaughan,* 3 *Burr.* 1516; *Anonymous,* 1 *Lord Raymond* 738; *Morris* v. *Lee,* 2 *Lord Raymond* 1396. There was not a case cited upon the argument, nor have my researches led me to one anterior to the decision of *Gill* v. *Cubitt,* which sustains the doctrine there propounded. I confidently conclude, therefore, that the case above criticised cannot stand on the ground of ancient authority. In my apprehension, the original rule as it existed in the time of Lords Kenyon and Mansfield was, that nothing short of *mala fides* would vitiate the title of the holder of negotiable paper taking it for value, before matur-ity. It is entirely out of the question, therefore, for this court to regard *Gill* v. *Cubitt* as imperative authority. It is true that that case was followed for a time to a considerable extent by the English courts. But, as I have already said, in England the original rule has been re-instated. In *Back-house* v. *Harrison,* 5 *B. & Ad.* 1098, Mr. Justice Patterson says: "I have no hesitation in saying that the doctrine *first laid* down in *Gill* v. *Cubitt,* and acted upon in other cases, has gone too far and ought to be restricted." And in *Good-man* v. *Harvey,* 4 *Ad. & El.* 870, Lord Denman thus forcibly expresses the rule at present prevailing in the courts at Westminster: "The question I offered to submit to the jury was, whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion that gross negligence only would not be a sufficient answer where the party has

given consideration for the bill. Gross negligence may be evidence of *mala fides*, but it is not the same thing. We have shaken off the last remnant of the contrary doctrine. Where the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title." The following cases recognize and enforce the same rule: *Uther* v. *Rich.*, 10 *Ad. & El.* 784; *Artbouin* v. *Anderson*, 1 *Ad. & El.* (*N. S.*) 498; *Stephens* v. *Foster*, 1 *Cromp., Mees. & Ros.* 894; *Palmer* v. *Richards*, 1 *Eng. L. & Eq.* 529; *Marston* v. *Allen*, 8 *Mees. & Wels.* 494; *Raphael* v. *Bank of England*, 17 *C. B.* 161.

An examination of the American reports will disclose a similar mutation of judicial opinion upon this subject. For a time, in several of the states, the rule broached in the case of *Gill* v. *Cubitt* has been acted upon; but now, in most of them, and in those of the most commercial importance, that rule has been entirely discarded. 34 *New York*, 247, *Magee* v. *Badger*; 7 *Bosworth* 543, *Bel. Bank of Ohio* v. *Hoge et al.*; 10 *Cush.* 488, *Worcester, &c., Bank* v. *Dorchester, &c., Bank*; 4 *Geo.* 287, *Matthews* v. *Poythress*; 6 *Md.* 509, *Elli-* v. *Martin*; 36 *New Hamp.* 273, *Crosby* v. *Grant.*

The subject has also recently been settled, after an elaborate discussion and full consideration in the Supreme Court of the United States, in the case of *Goodman* v. *Simonds*, 20 *How.* 343, the result being an explicit repudiation of the doctrine that suspicious circumstances will, *per se*, vitiate the title to commercial paper.

From this brief review of the cases, I think it may be safely said that the doctrine introduced by Lord Tenterden stands at the present moment marked with the disapproval of the highest judicial authority. Nor does such disapproval rest upon merely speculative grounds. That doctrine was put in practice for a course of years, and it was thus, from experience, found to be inconsistent with true commercial policy. Its defect—a great defect, as I think—was, that it provided nothing like a criterion on which a verdict was to be based.

The rule was, that to defeat the note, circumstances must be shown of so suspicious a character that they would put a man of ordinary prudence on inquiry—and by force of such a rule it is obvious every case possessed of unusual incidents would, of necessity, pass under the uncontrolled discretion of a jury. An incident of the transaction from which any suspicion could arise was sufficient to take the case out of the control of the court. There was no judicial standard by which suspicious circumstances could be measured before committing them to the jury. And it is precisely this want which the modern rule supplies. When *mala fides* is the point of inquiry, suspicious circumstances must be of a substantial character, and if such circumstances do not appear, the court can arrest the inquiry. Under the former practice, circumstances of slight suspicion would take the case to the jury; under the present rule, the circumstances must be strong, so that bad faith can be reasonably inferred. Thus the subject has passed from the indefinite to comparatively definite; from the intangible to the comparatively tangible. From a mere matter of fact, the question, to some extent, has become one of law. I cannot doubt, when we recollect that inquiries of this nature always attend that class of cases where judgments are sought against innocent and unfortunate parties, that the change is most beneficial. All experience has shown how hard it is to prevent juries from seizing on the slightest circumstance, to avoid giving a verdict against the maker of a note which had been obtained by fraud or theft. To preserve the negotiability of commercial paper ánd guard the interests of trade, it is absolutely necessary that large power should be placed in the judicial hand when the question arises as to what facts are sufficient to defeat the claim of the holder of a note or bill which has been taken before maturity, and for which value has been paid. It is only in this mode that the requisite stability in transactions of this kind can be retained. But I do not think the difference between the two rules above discussed is as great as some persons have supposed. In my apprehension, the entire variance consists in the degree

of proof which the court will require in order to submit the inquiry to the jury. Mere carelessness in taking the paper will not, of itself, impair the title so acquired; but carelessness may be so gross that bad faith may be inferred from it. Nor is it necessary, in order to defeat the title of the holder, that he have actual knowledge of the facts and circumstances constituting the particular fraud; it is sufficient if he have knowledge that the paper is tainted with any fraud, although he may be ignorant of the nature of it. In the case of *May* v. *Chapman*, 16 *Mees. & W.* 355, Baron Parke says: "I agree that 'notice and knowledge' means not merely express notice, but knowledge, or the means of knowledge, to which the party wilfully shuts his eyes." Reviewed in this sense, as I have already remarked, the principle seems to me a highly salutary one, and, in the language of Professor Parsons, is well "adapted to the free circulation of negotiable paper and the true interests of trade." 1 *Par. B. & N.* 259.

I think a new trial should be granted.

SCUDDER and VAN SYCKEL, Justices, concurred.